BONETA, PLAINTIFF AND APPELLANT, *v.* BONETA ET AL., DEFENDANTS AND APPELLEES (STRUBE, INTERVENOR AND APPELLEE).

APPEAL from the District Court of Arecibo in an Action for the Execution of a deed.

No. 1671.—Decided July 18, 1919.

PURCHASE AND SALE—CONTRACT—HEIRS.—As the contract of purchase and sale herein contains the elements inherent to every contract, to wit, consent, object

and consideration, the fact that the vendee had not paid the purchase price to the vendor does not prevent the conclusion that the heirs of the latter are under the obligation to carry out the contract by receiving the purchase price and executing the corresponding deed.

The facts are stated in the opinion.

Messrs. *Antonio Suliveres* and *José G. Torres* for the appellant.

Messrs. *R. Agrait Aldea, L. Mercader, Pedro Amado Rivera* and *O. M. Wood* for the appellees.

Messrs. *Enrique Rincón* and *Scoville & Kelly* for the intervenor.

Mr. Justice del Toro delivered the opinion of the court.

On November 23, 1912, Tomás Boneta died in the city of Arecibo. He left several children as his heirs. At the instance of interested persons Charles E. Lawton was appointed administrator of his estate.

One of the children, Luis Celestino Boneta, brought this action against the Succession of Tomás Boneta, represented by the said administrator and the other heirs. The complaint alleges that a certain contract for the purchase and sale of a rural property called Jobo of 1,100 acres situated in Río Arriba, Arecibo, was entered into between the plaintiff and the author of the succession and prays that the succession be ordered to carry out the contract by executing the corresponding deed.

Leopoldo B. Strube intervened in the suit and alleged, in synopsis, that he was the owner and held possession of the said property, which had been sold to him by Tomás Boneta for the deferred price of five thousand dollars which he was willing and ready to deliver. He prayed for judgment ordering the succession to carry out the contract by receiving the price and executing the corresponding deed.

Some of the defendant heirs confessed judgment, others answered in opposition to the complaint that the sale referred to by plaintiff Luis Celestino Boneta was simulated between father and son, and others failed to answer. As to the com-

plaint in intervention, two of the heirs denied its allegations; two others alleged that in fact there was a verbal contract between Boneta and Strube, but that it became void because Strube failed to comply with it; nine of them contended that Strube held possession of the property as lessee and not as owner; Luis Celestino Boneta admitted some of the allegations of the intervenor and denied others, and the remaining defendants did not answer.

The case went to trial and much documentary and oral evidence was examined. Finally the court rendered judgment dismissing the complaint of Luis Celestino Boneta and sustaining the complaint in intervention, consequently adjudging that the defendants execute in favor of Leopoldo B. Strube a public deed of sale to the property in question, its execution to take place upon the payment by Strube to the defendants of the sum of five thousand dollars together with interest at the rate of fifty dollars a month owed by Strube since July 1, 1911. Luis Celestino Boneta alone appealed from that judgment.

The appeal was first heard by three of the justices of this court and later by the full bench. We have considered carefully the pleadings, the evidence, the briefs and the arguments of counsel and have no doubt that the complaint of Luis Celestino Boneta was properly dismissed. The evidence was extensively analyzed by the trial judge. In some particulars we do not agree with his analysis, but we all agree with the result.

The greatest difficulty in getting at the merits of this case in order to arrive at a just decision is in weighing the evidence as to whether the contract, which undoubtedly was inchoated between Tomás Boneta and Strube, came to be perfected and continued in all its force in such a manner that the Succession of Boneta is bound to its performance.

The question which arises first is whether, none of the members of the Succession of Boneta having appealed except plaintiff Luis Celestino, this court being convinced that

the complaint was properly dismissed, should only affirm the judgment. We are inclined to answer that question in the sense that as the judgment was appealed from as a whole and as the scope and weight of the evidence regarding the contract between Strube and Boneta were fully discussed by counsel for both, parties, we can and should consider the claim acknowledged by the judgment below on its merits. Besides, in the opinion which we have formed of the case, the question is of no practical importance, because by different road we arrive at the same result, to wit: the affirmance of the judgment.

We agree with the trial court that the evidence shows the existence of a perfect contract between Tomás Boneta and Strube, as there was consent, subject-matter and consideration. According to section 1353 of the Civil Code, "The sale shall be perfected between vendor and vendee and shall be binding on both of them, if they have agreed upon the thing which is the object of the contract and upon the price, even when .neither has been delivered." Here the thing was delivered, but not the purchase price. The fact that the purchase price was not delivered does not prevent the conclusion, as has been seen, that the contract became perfected.

"Succession is the transmission of the rights and obligations of a deceased person to his heirs." Sec. 664–*a* of the Civil Code. Therefore the succession is bound in this case to perform the contract made by its ancestor and the district court correctly so adjudged.

The judgment appealed from is

*Affirmed.*

Chief Justice Hernández and Justice Hutchison concurred.
Mr. Justice Aldrey concurred in the judgment.
Mr. Justice Wolf concurred in the judgment in part.

CONCURRING OPINION OF MR. JUSTICE WOLF.

I agree with so much of the majority opinion as dismisses the complaint of Luis C. Boneta. Although a paper writing

was produced purporting to be a contract of sale, I think the court below was justified in believing that the price therefor had never been paid. This deduction was possible from the attitude and conduct of Luis C. Boneta, and his curious indifference to the property both before and after the discovery of the alleged deed. It was only after this discovery that he become active and his statements and the statements of other supposed witnesses as to the payment of the price were evidently not satisfactory to the court below and I find no reason to go against the general finding in this regard. Strube, too, gave testimony which the court had a right to believe to the effect that Boneta expressed himself in favor of letting Strube have the property and that said Boneta never claimed it.

On the other hand, Strube's alleged contract depends on the following rather informal facts:

In 1907 Leopoldo Strube was the owner of the farm Jobo. On or about that time he made a mortgage to Tomás Boneta for $5,000, with interest at the rate of 1 per cent a month, or $600 a year. Leopoldo Strube was at the time deeply indebted and one of his creditors was his aunt, Erica Schroeder, who on or about December, 1908, obtained an attachment against him in the Federal Court in the sum of $43,000, and among the properties attached was the farm Jobo. Swift & Company also obtained an attachment against the same property in the sum of $2,500. On December 31, 1908, Strube and Erica Schroeder made a contract by which Strube transferred to his said aunt a certain amount of property, including the farm Jobo. In this way Strube obtained a release of all the debts he owed his aunt, Erica Schroeder. Exactly when Strube parted with the possession of the property Jobo is not perfectly clear in the record, but he was out of possession in December, 1909. About this last-mentioned date Tomás Boneta and Strube entered into conversations about the property Jobo. Strube, in the main, is a truthful witness and was evidently believed by the court below, and I have no rea-

son to doubt much of his testimony, but some of his own appreciations of the situation between himself and Boneta are subject to doubt.   Strube testified that Tomás Boneta foreclosed his mortgage against the property Jobo inasmuch as the mortgage was overdue; that before foreclosing and after the transfer of the said property to Erica Schroeder, Tomás Boneta sent for Strube and said to the latter that he had no desire to proceed further with Erica Schroeder nor with her attorney, Paine, but that he would foreclose the property and that he desired to get his money, and that if Strube desired to repossess himself of the property he, Boneta, would foreclose the mortgage and sell Strube the property, provided the said Strube would pay all the costs that the suit to foreclose would occasion.   And in other parts of his testimony Strube says that the agreement between them was that Strube should pay $5,000 and all the costs and expenses that the execution would bring upon Boneta.

To my mind from the whole testimony it is perfectly clear that Boneta was willing to sell to Strube, but only willing to sell if Strube would save him, Boneta, harmless from any costs occasioned by the execution of the mortgage.   In other words, Boneta wished to have his mortgage for $5,000 free of any charges, and he did not want to retain the property. Strube testified that this proposition of Boneta's became a contract between them.   In any event, early in 1910 a foreclosure proceeding was begun and as Boneta was the highest bidder the property was sold to him in the sum of $6,125. Almost immediately after the sale of Jobo to Boneta, Strube was put in possession of the property in the name of Boneta. The books of Boneta were produced at the trial and therein is an account between Boneta and Strube wherein Boneta entered the payments of interest made by Strube.   This account was continued by Boneta after the foreclosure sale and payments of interest were entered as made every six months or so, without any change in the account by reason of the sale.

On March 29, 1910, the date of the foreclosure sale to Boneta, there is an entry in the books of $800 which, Strube says, was in part payment of the costs of the mortgage proceeding. Strube, however, took an I. O. U. (*vale*) for this $800 and there was nothing on the face of the I. O. U. to show that it was a receipt. Strube admitted that he took it in this form so that in case a deed was not made to the property he would have something in his favor. A second I. O. U., with similar conditions and reservations, was given by Boneta to Strube on July 18, 1910. On or about that date Strube and Boneta met in the office of notary Paz for the avowed purpose of executing a deed to the property Jobo, but although Strube maintained that he had settled his debts with his aunt, yet at this meeting a Mr. Koester appeared who offered to buy the property in the name of August Strube, the brother of Leopoldo. When the notary read the proposed deed Koester refused to enter into negotiations because the two attachments of Erica Schroeder and Swift & Company had not been canceled in the registry of property, so that the parties separated and nothing was done at that time to complete the alleged agreement between Strube and Boneta.

Cross-examined Strube said that the money belonged to his brother and except that this money would be forthcoming from his brother he would not have been able to make the alleged agreement with Boneta. Nevertheless, as soon as the date of this "frustrated" contract (*contrato fracasado*), as Strube dubs it, had passed by, Koester turned over the $5,000 to Strube, who devoted it to other purposes. It is not at all clear from the record why Strube did not take the property at this time, subject as it was, according to him, to two harmless attachments in the registry of property. However, Strube and Boneta together went to see attorney Martín Travieso and Strube said that Travieso was retained to get rid of these two attachments. Travieso's memory was apparently a little at fault because he testified that he was

retained to defend a suit of Erica Schroeder against Tomás Boneta. This suit, indeed, followed hard upon and interrupted the proceedings. It was a suit against Tomás Boneta to set aside the foreclosure sale, alleging various rights of Erica Schroeder, Travieso testified that his whole agreement with Boneta was to receive the sum of $600 in the defense of that suit and that Strube paid him $150 on account. Strube said that the $150 was solely to remove the attachments and the dates, apparently, bear him out. Subsequently and up to 1913, when the suit of Erica Schroeder was dismissed, Travieso made various attempts to recover the $450 balance from Strube, but Strube denied responsibility and referred him to the Succession of Boneta. In the correspondence between them it appears that Strube also made offers to pay Travieso, suggesting that he would reduce his fees on Strube's theory that while he was not immediately responsible as the property would be liable to come to him, he might be equally bound to pay it. I do not find in the record that the account of Travieso was ever settled.

On November 23, 1912, Tomás Boneta died intestate. A declaration of heirship was promptly taken by all the heirs and the property inventoried, and among the inventoried property was the farm Jobo.

Leopoldo Strube relied on an alleged executory contract of sale and offered to pay an alleged agreed price, or the balance of the agreed price, to obtain a specific performance of the alleged contract by the heirs of Tomás Boneta. The appellant very well draws attention to the fact that the legal relation between Tomás Boneta and Strube was a promise of sale in case certain things then not existing should be brought about. At the time of the alleged agreement Boneta was not the owner of the property and he could not sell to Strube a piece of property which was in the name of Erica Schroeder, so that at the time of the alleged agreement its terms were impossible of performance. Strube was merely agreeing that he would some time take the property off Bo-

neta's hands if Boneta did in point of fact foreclose the
property and buy it in himself. Boneta did foreclose and
buy in the property and he immediately put Strube ·in pos-
session. In spite of the fact that Strube does not mention
it, I think that he was just as anxious to be put back in pos-
session of the property and cultivate his crop of tobacco as
Boneta was anxious to have his money instead of the mort-
gage, and either to have Strube paying the interest or else
having somebody else paying the same. Strube was put in
possession of the property, it is true, but his payment of
$50 a month or even paying the taxes was only a just return
for the use and occupation of the land.

It does not appear anywhere that Strube at the time of
the alleged agreement between himself and Boneta, between
the Fall of 1909 and the Spring of 1910, paid any considera-
tion to Boneta or suffered any detriment. On the contrary
I think he was most anxious to be put into possession of the
property Jobo. The appellant also points out that if there
was any contract between Strube and Boneta, the latter did
everything that was required of him to fulfil it and that the·
alleged contract fell through. In point of fact, Boneta went
to the office of Paz Urdaz prepared to execute any kind of
a deed that Strube wanted, but Strube did not appear for.
himself but had his agent, Koester, appear, who had $5,000
belonging to Strube's brother and who was prepared to take
a deed for $5,000. The notary showed that the attachments
of Erica Schroder and Swift & Company appeared in the
registry of property as charges, and Koester refused to sign.

I think, whatever understanding there was between Bo-
neta and Strube, that Boneta had tendered a full performance.
Anything that he might do thereafter was out of the goodness
of his heart. In point of fact, both Strube and Boneta went
to the office of Travieso where, Strube says, they employed
the said attorney to get rid of the attachments. The attach-
ments, however, were still existing in 1915, at the date of
the trial. At the date of the trial, so far as these attachments

were concerned, nothing had happened to put Strube in a better condition to buy the property than he was on the day that Koester refused to sign. Almost immediately thereafter Koester turned the $5,000 over to Strube, who testified that he used it for other purposes. I think Boneta had a right to take the refusal of Koester to sign as releasing him from any existing obligation to Strube, if any there was. While the court apparently did not believe them, two or three witnesses testified that Boneta asserted in the office of Paz Urdaz the day of the frustrated contract that the negotiations were over. The attachments against the property devolved as much of an obligation on Strube as on Boneta, and they were no obstacle to the transfer of the property from Boneta to Strube. In 1910, then, he had a clear opportunity to buy the property Jobo and declined, and from that time on he made no further offer to buy the property until the commencement of this suit. This failure to act also has some bearing.

My attention has been drawn to section 1095 of the Civil Code, but my opinion is that it applies more particularly to a specific debt or to a person insisting on the performance of a contract and not to one who is resisting performance.

Some stress is laid upon the fact of the payment of $1,600 from Strube to Boneta in April and July of 1910, but they were not absolutely unconditional payments by Strube; he took negotiable paper in exchange. In the record it does not appear that any payments of interest were made by Strube to Boneta after that date, so that with the lapse of time, and given the practice of Boneta of deferring the collections, these payments could be considered by Boneta as properly being payments on account of the interest or rent for the use and occupation of the land. So could any payment of taxes, the obligation to pay which is not mentioned in the record. Any payment by Strube of taxes could even be considered voluntary and as no part of an agreement between himself and Boneta or, indeed, as I have said, as

part of the consideration, for use and occupation. Strube
testified that he took these I. O. U.'s in this form in case no
deed was ever made, and that Boñeta or the succession con-
sequently owed him. I think it is plain from the record that
Strube thought he had an option to do what he liked about
buying this property. In point of fact, as his testimony
showed, he relied on the word of Tomás Boneta, who also
felt himself free to do as he chose and who had a perfect
right in 1911 to convey the property to his son if he desired.
In this alleged agreement between Strube and Boneta there
would be a certain want of mutuality if Strube was right.
No one could compel him to take the property, but he could
compel Boneta or his heirs.

Section 1067 of the Civil Code provides that in mutual
obligations none of the persons bound shall incur default if
the other does not submit or properly fulfil what is incumbent
upon him. I do not think there was any fulfilment by Strube
up to the date of the suit.

Section 1071 provides that should the obligation not state
what conduct is to be observed in its fulfilment, that observed
by the good father of a family shall be required. I cannot
see that Strube has taken any due steps to demand a specific
performance of the contract that he alleged existed. He had
his opportunity to buy and his agent, Koester, refused to
buy. The attachments against the property still exist. After
the death of Boneta Strube still made no attempt to insist
on a specific performance, nor did he make any further at-
tempt to get rid of the attachments. The suit of Erica
Schroeder was dismissed about the time of Boneta's death.
The dismissal of this suit and the death of Boneta seemed to
have been the things that heartened the two claimants to at-
tempt to recover the property. Tomás Boneta is dead. In
his lifetime he would have done what he chose because he
was a man of force and an expert in affairs. After a man
has died the courts are slow to give effect to any alleged

agreements made by an intestate in the absence of a clear indication that such was his intention.